IN THE U.S. DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

**Jane Doe**,

      Plaintiff;

v.                                                                          Case No. CV 14-1005 RJW

**Alfredo Simon Cabrera**,

      Defendant.

# MOTION TO DISQUALIFY &
# MEMORANDUM IN SUPPORT THEREOF

Plaintiff Jane Doe, by and through her undersigned counsel and pursuant to this Court's August 18, 2015, Order, files this Motion to Disqualify and Memorandum in Support Thereof and states the following in support.

## INTRODUCTION

This Court has long been a leader in jealously guarding the integrity of the federal judiciary and ensuring the public trust in a fair and impartial judiciary. In this case, a law clerk's *ex parte* communications combined with the clerk's other ties to the law firm representing Defendant give rise to—at the very least—an appearance of impropriety. For two primary reasons, that appearance problem cannot be cured by simple assurances that the law clerk was screened from any "substantive" involvement in the case.

First, the law clerk's conflict of interest was not potential—it was actual. Her father is a "long-time" partner for defense counsel, Zuckerman Spaeder LLP ("Zuckerman Spaeder"), presumably with an equity stake in the firm and therefore a direct financial interest in this case, an interest that was never disclosed to the Plaintiff. Further, the law clerk entered into an

attorney-client relationship with one of the attorneys for Defendant and accepted free legal services from Defendant's law firm, two circumstances that implicate federal law, *see* 5 U.S.C. § 7353 (employee in judicial branch may not accept "anything of value" from person seeking official action before individual's employing entity), and were never disclosed to Plaintiff. These conflicts go far beyond the types of "potential" conflicts that can be addressed by a stringent screening process, and give rise to real questions about the impartiality of a judicial chambers in which the senior law clerk's loyalties are, at least from an appearance standpoint, so divided.

Second, the record raises questions about whether the law clerk acted in a manner consistent with an actual bias. Even according to the law clerk's carefully worded declaration, after attending proceedings in the case, she communicated with her co-clerk regarding the issuing of orders in this case, then, in a series of *ex parte* communications with her personal *pro bono* attorney (also Defendant's attorney), informed him and her father (her attorney's superior at the firm) of the timing of the orders, that they would be favorable to their client, and indicated that she had responsibility for those favorable orders. Given her obvious motivation for supporting one party over the other in this case, these actions create an appearance that the law clerk repaid favors given to her by Zuckerman Spaeder and her *pro bono* counsel by influencing judicial rulings—an appearance that fundamentally undermines the public impression of the Court's partiality and fairness.

Importantly, the resulting order that the law clerk discussed with the Zuckerman Spaeder attorneys was materially different from the oral ruling announced in open court. In fact, the written order gave the Defendant an additional benefit that the Court had specifically reserved judgment on and that Plaintiff had never had an opportunity to present argument about. The totality of the law clerk's actions constituted serious potential ethical breaches that evidence a

breakdown in the screening process. That the order at the center of the law clerk's actions gave unexpected benefits to the Defendant only solidifies the appearance of impropriety.

The issue now before this Court raises uncomfortable questions for all involved. A bright young lawyer, and those with whom she was associated, made unquestionably poor choices. Unfortunately, the issue is simply *not settled* by the two declarations provided by the Court's clerks, declarations that raise as many questions as they purport to answer.[1]

For instance, Plaintiff simply cannot know what, if any, communications the law clerk had with her lawyer and/or her father concerning the Court's deliberations on the case, the Court's view of the facts of the case, and/or confidential documents in the case that the law clerk may have accessed and potentially shared with lawyers on the case. Moreover, Plaintiff has no assurance that, throughout the law clerk's tenure, she did not subtly influence the Court's handling of the case in a manner similar to that revealed in her declaration. These questions are simply too significant to provide any adequate assurance to Plaintiff—and to the public—that no actual impropriety occurred. As such, consistent with this Court's long-standing view of judicial ethics, disqualification of the judge in this matter is warranted.

## BACKGROUND

### A.  The Court's Law Clerk Had a Preexisting Conflict of Interest

Marina Fernandez is a law clerk for the Hon. Reggie B. Walton of this Court. Her father, Jack Fernandez, is a "long-time" partner at Defendant's counsel Zuckerman Spaeder in the firm's Tampa office, where a deposition was held in this case. *See* Order, Aug. 18, 2015,

---

[1] Throughout this motion, Plaintiff has identified a number of remaining questions and nondisclosures about the conduct and communications of the law clerk, the Court, and Zuckerman Spaeder. To help resolve these uncertainties, Plaintiff issued subpoenas *duces tecum* to the law clerk and attorney whose actions are central to this dispute. Plaintiff reserves the right to issue additional discovery as necessary to gain a complete understanding of the facts and circumstances underlying this matter.

CM/ECF No. 75, Ex. A (the "Letter") at 2-3. Presuming Mr. Fernandez is an equity partner at Zuckerman Spaeder, Mr. Fernandez likely has a *direct* financial interest in the litigation. In addition, Ms. Fernandez "has developed friendships with a number of attorneys" at the firm. Order, Aug. 18, 2015, CM/ECF No. 75, Ex. B, Decl. of Marina Fernandez (the "Fernandez Declaration") at 1.

At the start of her clerkship, Ms. Fernandez was told by Judge Walton that she could not "participat[e] in any cases being litigated by the law firm of Zuckerman Spaeder." Fernandez Decl. at 1. On June 12, 2015, this case was removed to this Court and assigned to Judge Walton. At that point she was apparently told, not that she could not participate in the case at all, but, rather, that she could not have "substantive involvement" in the case. *Id.* at 2.

According to Zuckerman Spaeder, its attorneys on this case also "specifically understood" that she would be screened from this case. Letter at 2. Zuckerman Spaeder has not explained how this "specific" understanding was developed, nor has it clarified whether it obtained this understanding from *ex parte* communications with the Court, Ms. Fernandez, or some other individual associated with the Court. Ms. Fernandez's relationship with Zuckerman Spaeder, including her familial relationship with a senior equity partner of the firm, was never disclosed to Plaintiff by either the Court or Zuckerman Spaeder. On July 1, 2014, the Court issued its General Order and Guidelines for Civil Cases, stating that *ex parte* communications "are inappropriate and will not be tolerated." Gen. Order and Guidelines for Civil Cases, July 1, 2014, CM/ECF Doc. 8, at 2-3.

**B.    Ms. Fernandez Received Gifts From Counsel Who Had Appeared in the Case**

In January 2015, during the pendency of proceedings in this case, Ms. Fernandez was called to service with the U.S. Navy. Letter at 2. Although it was currently counsel in a case

proceeding in Judge Walton's chambers, Zuckerman Spaeder—apparently unconcerned that law clerks are expressly prohibited under numerous ethical codes from accepting valuable services from counsel in a case pending before the clerk's judge, *see infra* Sec. A, p. 12—agreed to represent her *pro bono* in the matter.[2] Indeed, instead of any of the other 82 attorneys at the firm who were not actively litigating before Judge Walton in this case, Zuckerman Spaeder *specifically* chose Benjamin Voce-Gardner, who had personally appeared on behalf of Defendant, to be her attorney.[3] Mr. Voce-Gardner's free representation of a law clerk in Judge Walton's chambers while this case was pending before him was never disclosed to Plaintiff by either Zuckerman Spaeder or the Court.

On June 29, 2015, the Court was contacted to resolve a dispute that had arisen during a deposition. Ms. Fernandez answered the phone and stated that the law clerk assigned to the case was not available. Fernandez Decl. at 2. Instead of immediately informing those on the call that she was not to participate in the case because of a conflict of interest—a fact that would, of course, have been news to Plaintiff—she instead received the participants' descriptions of the

---

[2] Zuckerman Spaeder's counsel told Plaintiff's counsel in an informal phone call that the representation was *pro bono*. In her declaration, Ms. Fernandez stated that she pays for her own meals when socializing with Zuckerman Spaeder's attorneys, which "includes the time I have spent with Mr. Voce-Gardner." Decl. of Marina Fernandez at 1. She then declares that "I paid for all known expenses during the course of his representation." Unfortunately, Ms. Fernandez does not state in her declaration whether she actually paid for Mr. Voce-Gardner's legal fees in the representation; given the statement's context, it does not appear that "expenses" such as meals would include legal fees or that she is expressly disclaiming that the representation was *pro bono*. Ambiguities such as this in the Declaration do not build Plaintiff's confidence that it is a full and complete disclosure of all the facts and circumstances relevant to this matter.

[3] Ms. Fernandez states in her declaration that she "became friends" with Mr. Voce-Gardner in January 2015, but does not state whether she knew or was acquainted with him at some time before that, either through Zuckerman Spaeder, their shared military backgrounds, or otherwise. Fernandez Decl. at 1. Although, according to its website, Zuckerman Spaeder currently has seven associates in its Washington office, all of whom are admitted to practice in the District of Columbia, the firm selected Mr. Voce-Gardner—an associate in the firm's New York office—to appear in this case *pro hac vice*. *See* Minute Order, June 23, 2014, CM/ECF No. 5.

issues in dispute and took it upon herself to convey this information to the judge. *Id.* Although Zuckerman Spaeder was aware that Ms. Fernandez was to have no participation in the case, its attorneys did not react in any way to her hearing the parties' arguments or being the one who presented them to the judge. The judge's ruling in that dispute was favorable to Zuckerman Spaeder.

After the hearing, Ms. Fernandez sent a text message to Mr. Voce-Gardner—her "friend" and personal attorney at least as recent as the previous month[4]—stating, "Are you in dc and neglected to tell me." Letter at 2. Mr. Voce-Gardner responded, "Nope! Why? I'm coming down for the day tomorrow but I'm only on the ground for about 6 hours." *Id.* Ms. Fernandez then wrote, "Bummer. Just felt [*sic*][5] with an over the phone objection in one of your cases, thought you might be here." *Id.* Plaintiff has not been provided with a copy of these *ex parte* communications.

Mr. Voce-Gardner was only admitted in one case in this Court, and only one case before Judge Walton—this case. Though this text message was an *ex parte* communication from Ms. Fernandez to Zuckerman Spaeder, and suggested, or should have suggested, to him that she had some level of participation in the case, Mr. Voce-Gardner took no further action and Plaintiff was never informed of this exchange. Ms. Fernandez and Mr. Voce-Gardner then had numerous communications regarding supposedly "personal and unrelated" topics, communications that Zuckerman Spaeder has chosen not to disclose. Letter at 2.

**C.   Ms. Fernandez Implies Responsibility for An Undue Benefit Granted to Defendant**

---

[4] Ms. Fernandez has stated that she had conversations with Mr. Voce-Gardner about the substance of his representation of her as late as May 2015. Fernandez Decl. at 1 n. 1.

[5] The letter from Zuckerman Spaeder inserted a "[*sic*]" next to this word. Plaintiff agrees that this word likely was meant to be "dealt" and was perhaps autocorrected by her phone.

On August 5, 2015, a hearing was held before the Court on three motions: Defendant's Motion to Conduct a Mental Health Examination of the Plaintiff; Defendant's Renewed Motion to Disclose the Plaintiff's Grand Jury Testimony; and the Plaintiff's Motion to Strike two of Defendants' expert witnesses. Ms. Fernandez attended the hearing and sat with the other law clerks in the courtroom. During the hearing, the following exchange between Defendant and the Court occurred:

> THE COURT: Are you seeking to reopen her deposition based upon what was said before the Grand Jury? I hadn't heard that before. Is that what you're seeking to try and do?
> MR. FETTEROLF: We noted at the deposition that upon getting the transcript, upon reviewing it we reserve the right upon looking at it to reopen the deposition. And at that point if he opposes it we'd file a motion before you. It's all premature. I may get it and read it and go I got all I need.
> THE COURT: I'll cross that bridge when I get to it.

Tr. of Mots. Hr'g Before the Hon. Judge Reggie B. Walton, Aug. 5, 2015, at 41, attached hereto as **Exhibit A**.

The Court ruled in favor of Zuckerman Spaeder on each of the three motions. After the hearing, Ms. Fernandez then "reminded" her co-clerk to file paper orders memorializing the oral rulings made in the case. Fernandez Decl. at 3. The following day, on Aug. 6, 2015, she asked the co-clerk about the status of paper orders for this case. *Id.* The full extent and content of these reminders and inquiries, including whether Ms. Fernandez provided her co-clerk any input on what she believed happened at the hearing or any other input into what was to be included in the orders, has not been disclosed.

At approximately 3 p.m., Ms. Fernandez sent Mr. Voce-Gardner a text message stating, "You're going to owe me a beer … fyi." Letter at 1. Plaintiff has not received a copy of that communication. At 3:34 p.m., the Court filed an order granting the Defendant's Renewed

Motion for Disclosure of Grand Jury Testimony, as the Court had orally ruled the day prior. However, although Defendant's counsel represented that he had not yet decided whether to file a motion to reopen the Plaintiff's deposition on the basis of her grand jury testimony, and the Court had stated at the hearing that it would "cross that bridge when I get to it" on the issue, the Order *additionally* stated that, inconsistent with that statement by the Court and in the absence of any argument by Plaintiff on the matter, "should the defendant choose to reopen the plaintiff's deposition and explore topics concerning data retriever from her cellular phone … the defendant may also explore any topics regarding her grand jury testimony." Order, CM/ECF No. 72, Aug. 6, 2015. The order therefore materially differs from the Court's oral ruling the previous day, in a manner favorable to Defendant on an issue Defendant had not even yet filed a motion on and had not been substantively argued.

At approximately 4 p.m., Ms. Fernandez sent a text message to her father that, apparently, was "similarly worded" to her prior message to Mr. Voce-Gardner; this message, however, has not been disclosed by Zuckerman Spaeder or admitted by Ms. Fernandez.[6] Letter at 2. At about 4:30 p.m., Ms. Fernandez wrote Mr. Voce-Gardner again, stating, "Yes, as of 3:34 today you owe me a beer (or wine!)." *Id.* Zuckerman Spaeder has represented that Mr. Voce-Gardner did not respond to these text messages, but neither the law firm nor Ms. Fernandez has stated whether or not her father responded to the message sent to him, or whether anyone else at the firm communicated with Ms. Fernandez after these messages.

At some point later, the exact timing of which Zuckerman Spaeder has not disclosed, Ms. Fernandez sent Mr. Voce-Gardner yet another text message, asserting, "Dude, it's a joke.

---

[6] Although this text message was confirmed by Zuckerman Spaeder, Ms. Fernandez omits any mention of it in her Declaration.

Let's catch up soon for real though." *Id.* Although Ms. Fernandez has declared that this message was sent after she realized "how the texts appeared," Fernandez Decl. at 3, it is unclear whether she came to this realization after communicating or consulting with any other individuals. At a further undisclosed time later that evening, Ms. Fernandez placed a phone call to Mr. Voce-Gardner that was not answered by him. Letter at 1. None of the actual text messages constituting these *ex parte* communications have been provided to Plaintiff.

Although Mr. Voce-Gardner advised the partner on this case, Jon Fetterolf, of these improper *ex parte* text messages, Zuckerman Spaeder apparently elected not to immediately bring this to the attention of either the Court or Plaintiff. Instead, at some undisclosed point in the following four days, Ms. Fernandez informed the Court of the text message exchange, Fernandez Decl. at 3, though it remains unclear whether, through *ex parte* communications with Zuckerman Spaeder (including by partner Jack Fernandez) or some other person, she was prompted to make the Court so aware. On August 10, the Court scheduled an emergency hearing and, on August 11—*five days* after it became aware of the improper *ex parte* communications from Ms. Fernandez—Zuckerman Spaeder, anticipating the subject of the hearing, sent a letter to the Court informing it of the communications and partially explaining the circumstances of the firm's extensive history of interactions with Ms. Fernandez. The letter and related phone calls between Plaintiff's and Defendant's counsel that day was the first that Plaintiff was made aware of any relationship or interactions between Ms. Fernandez and Zuckerman Spaeder.

The Court conducted an emergency hearing on August 18, 2015. In that hearing, the Court informed the parties of the two declarations that had been completed by the law clerks, though those documents were not provided prior to the hearing. Plaintiff made three oral motions—a motion to vacate all of the August 5, 2015, rulings; a motion to disqualify the judge;

and a motion to stay the proceedings until a decision was reached on disqualification—all of which were denied. The Court invited Plaintiff to file the instant motion and subsequently set a briefing schedule. Plaintiff has since consulted with Keith Swisher, an expert in judicial ethics, about these matters, and he has provided an opinion in support of this Motion, attached hereto as **Exhibit B**  (the "Expert Affidavit").

## **ARGUMENT**

As "handpicked legal advisors with considerable … influence over the outcome of cases," *Uniloc USA, Inc. v. Microsoft Corp.*, 492 F.Supp.2d 47, 58 (D.R.I. 2007), law clerks' roles in judges' decision-making "may be quite significant," *Hamid v. Price Waterhouse*, 51 F.3d 1411, 1416 (9th Cir. 1995).

> Law clerks are not merely the judge's errand runners. They are sounding boards for tentative opinions and legal researchers who seek the authorities that affect decision. Clerks are privy to the judge's thoughts in a way that neither parties to the lawsuit nor his most intimate family members may be.

*Hall v. Small Bus. Admin.*, 695 F.2d 175, 179 (5th Cir. 1983) (citing *Fredonia Broad. Corp. v. RCA Corp.*, 569 F.2d 251, 256 (5th Cir. 1983)). Given that role and its influence, "[i]t is the duty of the law clerk 'as much as that of the trial judge to avoid any contacts outside the record that might affect the outcome of the litigation.'" *Id.* (citing *Kennedy v. Great Atl. & Pac. Tea Co.*, 551 F.2d 593, 596 (5th Cir. 1977)).

Rather than avoid such contacts at Zuckerman Spaeder, Ms. Fernandez actively sought them out, and the firm was more than willing to engage her. Her actions have demonstrated an actual bias and created an appearance of impropriety, both of which require the Court's disqualification. The imperfect screening of the Ms. Fernandez—which did not prevent her from participating in the case or from sharing, *ex parte*, confidential information with counsel for one

of the parties—has not and will not eliminate the effect of that bias or cure the appearance of impropriety.

### A.  <u>Ms. Fernandez Has a Conflict of Interest and an Actual Bias in this Case</u>

There can be little question that Ms. Fernandez has both an actual conflict of interest and an actual bias in this case. Her father is a "long-time" partner at a law firm in the case, and she has many friends at the firm. While employed in Judge Walton's chambers, Ms. Fernandez accepted *pro bono* legal representation from the attorney for the defendant in this case, a case in which her father likely had a direct financial interest. The conflict of interest is apparent.

Her actual bias is also exhibited in the *ex parte* communications to Zuckerman Spaeder indicating the timing of filings in the case and stating that they "owe" her for the favorable substance of orders in the case.[7] These communications did not just indicate that she had an interest in Zuckerman Spaeder's success in the case—they indicated that she was actively attempting to assist in that success. Her actual bias in favor of Zuckerman Spaeder is likewise evident.

Indeed, Ms. Fernandez's actions are similar to those of the law clerk in *Vaska v. State*, 955 P.2d 943 (Alaska 1998). In that case, the clerk sent the prosecutor in the case a copy of a bench memorandum she had drafted along with a note stating, "FYI—Just so know how great a

---

[7] Ms. Fernandez states in her declaration that, because she is pregnant and not currently consuming alcohol, her statements that she *would* be owed by Zuckerman Spaeder a beer for upcoming filings in its favor, and subsequently *was* in fact owed beer or wine for those filings in its favor, must have been made in jest. Fernandez Decl. at 3. Of course, no time element was included on her comment that she was "owed" beer or wine by Zuckerman Spaeder; she obviously could have been provided a drink at some point after pregnancy. Moreover, this information indicates the possibility that when Ms. Fernandez later wrote, "Dude, it's a joke," she was referring only and specifically to the drinking of alcohol, and was not disclaiming the whole of her prior text messages. Either way, the details of what she said she would be owed and, later, was actually owed, do not detract from her clear insinuation that she provided a favor to the firm and Mr. Voce-Gardner specifically.

friend you have here—This is an indication of the battles I take on for you guys (and, of course, for the law)." *Id.* at 944. The clerk had a personal relationship with another prosecutor in the office. *Id.* The Court of Appeals of Alaska stated that the clerk's personal relationships within the prosecutor's office indicated that she may have had an actual personal bias in favor of an attorney in the case. *Id.* at 946.

As in *Vaska*, Ms. Fernandez's conduct potentially violated a number of ethical codes and regulations applicable to her, including lending the "prestige of the office … to appear to advance the private interests of others." Code of Ethics for Judicial Employees ("CEJE") Canon 2. She has implied to one of the parties in the case that she is in a position to perform a "function of a court in a manner that improperly favors any litigant or attorney." *Id.* at 3(C). In doing so, she, as an attorney barred in Maryland, also potentially violated Maryland Lawyers Rule of Professional Conduct 8.4(f) ("It is professional misconduct for a lawyer to … state of imply an ability to influence improperly a government agency or official or to achieve results that violate the Maryland Lawyers' Rules of Professional Conduct or other law[.]").

Ms. Fernandez also disclosed to one of the parties in this case "confidential information received in the course of official duties"—defined as "information obtained in the course of a law clerk's work that is not available to the general public" and including "[t]he timing of a judge's decision or order[.]" "Ethics for Federal Judicial Law Clerks," Federal Judicial Center (2002), at p. 6. She has also violated federal law by accepting *pro bono* legal representation by a law firm seeking "official action from, doing business with, or … conducting activities regulated by" the Court. 5 U.S.C. § 7353; *accord* Judiciary Conference Regulations on Gifts §§ 620.25 &

MOTION TO DISQUALIFY

620.35; CEJE Canon 3(F); Ethics for Federal Judicial Law Clerks at 17-18.[8] These potential ethical violations involve a very real conflict of interest and a demonstrated actual bias that are significantly more problematic than the mere hypothetical or presumed conflict of interests that courts often encounter.

**B.** **Actual Bias May Be Imputed to a Judge, Requiring Recusal**

Actual bias of a law clerk may be imputed to the judge. *See U.S. v. Murphy*, 768 F.2d 1518, 1539 n. 3 (7th Cir. 1985) (stating that *Hall*, 695 F.2d 175 (law clerk had previously written letter criticizing party for conduct at issue in lawsuit and had accepted employment with opposing party), is "best understood as a case of actual bias (of the clerk) being imputed to the court")[9]. Where such actual bias of a law clerk is demonstrated, it is "not simply … an 'appearance' case," and can require the judge's recusal. *Id.*; *accord Parker v. Connors Steel Co.*, 855 F.2d 1510, 1525 (11th Cir. 1988); *Baugh v. City of Milwaukee*, 829 F. Supp. 274, 275 (E.D. Wis. 1993). A judge may be disqualified based on the law clerk's actual bias even where the law clerk never expresses an opinion on the case to the judge and the judge asserts that his decision-making was not influenced by the clerk. *Hall*, 695 F.2d at 178.

---

[8] Mr. Voce-Gardner and Zuckerman Spaeder's provision of gifts to a law clerk in the chambers of a judge before whom they had active, ongoing litigation potentially implicate D.C. Rule of Professional Conduct 3.5, which prohibits an attorney's attempt to exercise improper influence upon a tribunal. Plaintiff reserves the right to seek disqualification of Defendant's counsel for bestowing such gifts and engaging in such undisclosed *ex parte* communications as discussed herein.

[9] In *Hall*, the law clerk attended hearings and completed a rough draft of the opinion in accordance with the judge's direction. Neither *Hall* nor the Seventh Circuit in *Murphy* expressly held that an actual bias is only imputed to a judge where the law clerk participates in the matter, though some subsequent courts have impliedly interpreted *Hall* to mean that, *see Mathis v. Huff & Puff Trucking, Inc.*, 787 F.3d 1297, 1311 (10th Cir. 2015); *Milgard Tempering, Inc. v. Selas Corp. of Am.*, 902 F.2d at 714.

Here, the law clerk acted in a manner consistent with actual bias in favor of Zuckerman Spaeder and that bias is imputed to the judge. This is "not simply … an 'appearance' case," and the appearance cases upon which Zuckerman Spaeder is likely to rely insufficiently pertain to the scope of misconduct committed by the law clerk here. Even if the law clerk never expressed opinions on the merits to this Court and the Court believes its decision-making was not influenced by the clerk's bias, disqualification is still appropriate.

### C. **Ms. Fernandez Participated in the Case and was Inadequately Screened**

1. A Law Clerk Cannot Have Any Involvement in a Case Posing a Conflict

Courts generally do not impute law clerks' conflicts of interest to a judge where the law clerk has no participation in the case giving rise to the conflict. *Hall*, 695 F.2d at 179. This requires that the law clerk have *no* involvement in the case, *Baugh*, 829 F. Supp. at 276; *Trammel v. Simmons First Bank of Searcy*, 345 F.3d 611, 613 (8th Cir. 2003) (disqualification unnecessary where law clerk did not have "any involvement *whatsoever*" in the case) (emphasis added); *Hamid*, 51 F.3d at 1416 (no appearance of impropriety where law clerk had "no involvement" in case); *see also Vaska*, 955 P.2d at 946 ("If a judge's law clerk is actually biased for or against a party or attorney, of if the law clerk has a substantial personal interest in the outcome of litigation, then the law clerk should not participate *in any facet of the case*.") (emphasis added), which courts have described as being "completely sealed … off," *Milgard Tempering, Inc. v. Selas Corp. of Am.*, 902 F.2d 703, 714 (9th Cir. 1990), "walled off," *In re Nazi Era Cases Against German Defs. Litig.*, 153 Fed. Appx. 819, 826 (3d Cir. 2005), or "isolate[ed]," *id.*; *Byrne v. Nezhat*, 261 F.3d 1075, 1103 (11th Cir. 2011); *see also Santos v. Countrywide Home Loans*, No. Civ. 2:09-2642 WBS DAD, 2009 WL 5206682 at *6 (E.D. Calif. Dec. 21, 2009), from the litigation.

- 14 -

Because, as courts have recognized, "[e]ven when a judge attempts to isolate a law clerk from any direct involvement in cases in which the law clerk has a conflict, there is no assurance that the problems created … will be avoided," *Santos*, 2009 WL 5206682 at *8, it is important that, where a law clerk has a conflict of interest, she be instructed by the judge "not to do *any* work on the matter," *First Interstate Bank of Ariz., N.A. v. Murphy, Weir & Butler*, 210 F.3d 983, 989 (9th Cir. 2000) (emphasis in original); *see also Reddy v. Jones*, 419 F. Supp. 1391 (W.D.N.C. 1976) (disqualification unnecessary when law clerk with conflict of interest was "taken off *all* work, conference, hearings, or other activity, *including the delivery of messages*" in the case) (emphasis added). Instructing the law clerk merely "not to do *substantive* work" on the matter does "not go far enough to forestall recusal." *First Interstate Bank of Ariz.*, 210 F.3d at 989 (emphasis in original). Courts have upheld a judge's screening efforts where it has been satisfied that the judge has done "everything he could do" to preserve the appearance of impartiality of the court. *Milgard Tempering*, 902 F.2d at 714. Unfortunately, this strict separation of the law clerk from the case posing the conflict was not achieved here.

Ms. Fernandez was originally told at the start of her clerkship not to participate in Zuckerman Spaeder matters at all. For this case, however, she was instead instructed not to have "substantive involvement." Relatedly, she and her co-clerk have declared that she has not "substantively assisted" or provided "substantive input" to Judge Walton in this case (though it is unclear what assistance and input would qualify to the clerks as "substantive" and which tasks were performed by Ms. Fernandez that would not be included in that definition).

2.  <u>Ms. Fernandez Had Involvement in the Case</u>

In any case, it is evident from the limited facts already disclosed that Ms. Fernandez was not "completely sealed … off," "walled off," or "isolate[ed]" from the matter and an objective

observer would not think she had been. In one instance on June 29, 2015, Ms. Fernandez received a phone call from parties in this case wishing to bring a discovery dispute before the judge. Rather than immediately inform participants in the case that she was screened from the matter and transferring the call to another law clerk or directly to the judge, Ms. Fernandez remained silent about her conflict of interest, received the parties' descriptions of their dispute, and was responsible for conveying those descriptions of that dispute to the judge.

Ms. Fernandez therefore had an opportunity to use her demonstrated actual bias to slant or skew her representation of the dispute to the judge, a dispute that was resolved in favor of Zuckerman Spaeder. Concerns about using a conflicted law clerk as a filter for information about a litigation dispute has likely prompted courts' requirements that such clerks do not serve even as a messenger in conflicted matters. *See, e.g., Reddy*, 419 F. Supp. at 1391 (clerk taken off *all* work involving case with conflict, "including the delivery of messages"). Indeed, she later contacted Mr. Voce-Gardner directly to inform him that she participated in this teleconference (in a text message that Mr. Voce-Gardner apparently did not inform anyone about). Given the content of her subsequent text messages to Mr. Voce-Gardner involving the case, it is not unrealistic to assume she so contacted him on June 29, 2015, to imply she had an opportunity to benefit him and used that opportunity to benefit his firm.

Ms. Fernandez then sat in on at least one hearing in the case. She sat with the other law clerks—as opposed to sitting with other public observers in the gallery—thereby representing to the attorneys and the public that she was attending the hearing on behalf of the judge and in accordance with her duties as a clerk. It is highly unlikely that a law clerk would sit in on a lengthy motions hearing and not have any communications whatsoever, verbal or non-verbal, with her co-clerks or anyone in else chambers about what they all had jointly witnessed. Even if

she did not comment to the Court, she was in a position to overhear the Court's discussions regarding the hearing and to relay those concerns to her attorney and/or her father. Indeed, she later took it upon herself to prompt a co-clerk to draft and complete filings in the case and then, the following day, "inquired" about such filings with the co-clerk. The full extent of these promptings, inquiries, and other communications is not currently known.

### 3. Ms. Fernandez Had Access to Confidential Information That She Imparted to Defendant

Ms. Fernandez was not screened from upcoming filings being made in the case. Fernandez Decl. at 3. Indeed, that she engaged in *ex parte* communications—which this Court has deemed "inappropriate" and said "would not be tolerated"—with Mr. Voce-Gardner and her father[10] to inform them about the timing of those filings and the favorable nature of their contents indicate that she had continuing knowledge about confidential matters in the case. Most alarmingly, however, Ms. Fernandez also stated that attorneys at Zuckerman Spaeder would "owe" her for the substance of a filing.

Given the Court's ruling the day prior granting disclosure of the grand jury testimony, Zuckerman Spaeder would, obviously, not "owe" Ms. Fernandez unless she had exercised influence in the initial decision (something Ms. Fernandez, her co-clerk, and the Court all deny), *or* exercised influence to give Zuckerman Spaeder an additional benefit that had not been granted (or even substantively considered) at the hearing. (Of course, such an additional, material benefit was exactly what Zuckerman Spaeder received in the resulting order.) Ms. Fernandez's own

---

[10] Zuckerman Spaeder was aware of *ex parte* communications by Ms. Fernandez at least on June 29, 2015, and Aug. 6, 2015, yet made no effort to inform the Court until after the scheduling of an emergency hearing that the law firm correctly assumed would address those communications. The activities of Mr. Voce-Gardner, Mr. Fernandez, and others at Zuckerman Spaeder in carrying on such communications with Ms. Fernandez contravene the Court's General Order and potentially implicate D.C. Rule of Professional Conduct 3.5, which prohibits an attorney from attempting to improperly influence a tribunal through *ex parte* communications.

messages to counsel for one of the parties in the case evidence that she had participation or influence in this case.[11] This evidence of participation and influence is not fairly counterbalanced merely by an untested, self-serving affidavit disclaiming it.

A law clerk who was "completely screened … off" or "isolated" from the case would not have had an opportunity to receive the parties' positions on a dispute and deliver her interpretation of those positions directly to the judge. That law clerk would not have had access to confidential information about the case that could be used to advance the law clerk's actual bias, as Ms. Fernandez so used information here. Such a law clerk would not be attending hearings and interacting with co-clerks about filings—filings that later go beyond the judge's oral rulings to give one party additional benefits not asked for, decided, or argued in open court. As largely shown in Ms. Fernandez's improper *ex parte* communications and other misconduct, everything that could be done to preserve the appearance of the Court's impartiality was not done. *See Milgard Tempering*, 902 F.2d at 714. The failure to fully screen Ms. Fernandez and the implication that she exercised influence to, at minimum, generate an order giving additional beneficial rulings to Defendant gives rise to the <u>appearance</u> of impropriety.

---

[11] Plaintiff does not, and should not have to, put stock in Ms. Fernandez's assertions in her follow-up text message—the exact timing of which has not been disclosed by either her or Zuckerman Spaeder—and declaration that she was only joking when she made these statements. For one, as she has admitted, she only sent this subsequent note after Mr. Voce-Gardner did not respond to her original messages and she reflected on their impropriety. Fernandez Decl. at 3. (Whether or not she reached this conclusion individually or in consultation with others is as yet unknown.) Her correction was therefore primarily intended to minimize her ethical misconduct. Second, as discussed *supra* note 7, her message that she was joking could have referred only to her request for alcohol, which she apparently was not consuming at that time. Either way, given the totality of the circumstances regarding her communications, a reasonable lay observer certainly would regard her assertion that she was joking as an after-the-fact attempt to minimize misconduct, not as a genuine explanation of her motivation.

**D. The Appearance of Impropriety Requires the Judge's Recusal**

1. An Improper Appearance is Judged from the Perspective of an Objective Layperson

Pursuant to 28 U.S.C. § 455(a), a judge must disqualify himself "in any proceeding in which his impartiality may be questioned." Under that statute, "perception is reality," such that "a judge may be required to recuse even in the absence of an actual bias." *Uniloc USA*, 492 F.Supp.2d at 53; *Alexander v. Primerica Holdings, Inc.*, 10 F.3d 155, 162 (3d Cir. 1993) ("For purposes of § 455(a) disqualification, it does not matter whether the district court judge actually harbors any bias against a party or the party's counsel.").

> Judicial ethics … command impeccable appearance. Purity of heart is not enough. Judges' robes must be as spotless as their actual conduct. These expectations extend to those who make up the contemporary judicial family, the judge's law clerks and secretaries.

*Hall*, 695 F.2d at 176-177; *see also First Interstate Bank of Ariz.*, 210 F.3d at 985 ("[J]udges and law clerks are required to preserve the court's impartiality and the appearance of impartiality."); *Parker*, 855 F.2d at 1523 (inherent in § 455(a) is the "principle that our system of 'justice must satisfy the appearance of justice'" and purpose of statute "is to promote confidence in the judiciary by avoiding even the appearance of impropriety whenever possible") (quoting *Offutt v. United States*, 348 U.S. 11, 14 (1954), and *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847 (1988)); *Milgard Tempering*, 902 F.2d at 714 ("Section 455(a) governs circumstances that appear to create a conflict of interest, even where none really exists.") (citing *Davis v. Xerox*, 811 F.2d 1293, 1295 (9th Cir. 1987)); *United States v. Jordan*, 49 F.3d 152, 155-156 (5th Cir. 1995) ("Put simply, avoiding the appearance of impropriety is as important in developing public confidence in our judicial system as avoiding impropriety itself."). In this analysis, it is

immaterial whether the law clerk actually has an effect on the judge's decision or not. *Hall*, 695 F.2d at 179.

Section 455(a) therefore requires that the appearance of impropriety be weighed under an objective standard. *See Moran v. Clarke*, 296 F.3d 638, 648 (8th Cir. 2002) (section 455(a) "sets an objective standard that does not require scienter").[12] The "fact specific" § 455 analysis, *Mathis v. Huff & Puff Trucking, Inc.*, 787 F.3d 1297, 1311 (10th Cir. 2015), permits only consideration of "objective facts" and "factors that tend to lessen the appearance of impartiality must likewise be objectively ascertainable." *Parker*, 855 F.2d at 1526 n. 17 (citing *Hall*, 695 F.2d at 179). Accordingly, determining whether an appearance of impropriety is present "focuses on what is revealed to the parties and the public, as opposed to the existence in fact of any bias or prejudice." *Hall*, 695 F.2d at 178.

The analysis cannot "extend to what happens in the judge's chambers … because, were that so, the test would not be the impartiality but the absence of actual prejudice." *Id.* at 179. As the Third Circuit has described, under § 455(a), if a reasonable layperson, "were he to know all the circumstances, would harbor doubts about the judge's impartiality … then the judge must recuse." *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d 283, 343 (3d Cir. 1998) (internal citations removed); *In re Kensington Int'l Ltd.*, 368 F.3d 289, 308 (3d Cir. 2004) ("the appearance of impropriety must be viewed from the perspective of the objective, reasonable layperson"); *see also Mathis*, 787 F.3d at 1310 ("The reasonable observer is not the judge or even someone familiar with the judicial system, but rather an average member of the public."). The "hypothetical reasonable person under § 455(a) must be someone outside the judicial system because judicial insiders, 'accustomed to the process of dispassionate decision making and

---

[12] The D.C. Circuit applies the same standard. *See* Expert Aff. At 7.

keenly aware of their Constitutional and ethical obligations to decide matters solely on the merits, may regard asserted conflicts to be more innocuous than an outsider would.'" *In re Kensington Int'l*, 368 F.3d at 303 (quoting *United States v. DeTemple*, 162 F.3d 279, 287 (4th Cir. 1998)).

2. A Law Clerk's Conflict of Interest May Require Disqualification of the Judge

If the judge himself "harbors any doubts concerning whether his disqualification is required he should resolve the doubt in favor of disqualification." *Parker*, 855 F.2d at 1524 (citing *United States v. Alabama*, 828 F.2d 1532, 1540 (11th Cir. 1987)); *Hall*, 695 F.2d at 178-179. When the objective standard of § 455(a) is applied to law clerk conflicts of interest, "even if the judge has no reason to recuse herself based upon her own circumstances, a law clerk's relationships might cause the impartiality of the decisions from that judge's chambers in which the clerk participates reasonably to be questioned." *Hamid*, 51 F.3d at 1416. Such doubts about the objective appearance of impropriety are present here, where the law clerk had a conflict of interest, a demonstrated actual bias, and an inappropriate level of participation in the case.

To begin, Ms. Fernandez's father is a "long-time" partner at Zuckerman Spaeder with a probable direct financial interest in this case. The 11th Circuit has previously held that, where a law clerk's father was a senior partner at a law firm representing a party before the Court, that "close familial relationship … might lead an objective observer to believe that the firm would receive favorable treatment from the judge." *See Parker*, 855 F.2d at 1524; *accord In re Allied-Signal, Inc.*, 891 F.2d 967, 970 (1st Cir. 1989) (because "the relationship of clerk to judge itself is close," objective observer could "find an appearance of undue influence" where the clerk has a close familial relationship with counsel in a case). Moreover, in addition to this relationship and other friendly associations with attorneys at Zuckerman Spaeder, Ms. Fernandez received free

legal representation not just from the firm, but from an *actual attorn*ey appearing before her judge. When a judge "surrounds himself with individuals who may not be truly disinterested," it creates a presumption that the judge is "'tainted and must be disqualified.'" *In re Kensington Int'l*, 368 F.3d at 308.

As discussed above, a law clerk's having no participation in the case posing the conflict of interest typically minimizes an appearance of impropriety. Here, however, the Court's screening procedures failed to prevent Ms. Fernandez from fully separating herself from the case. Ms. Fernandez heard argument from parties in this case on a disputed issue and subsequently reported those positions to the judge—a circumstance that the 11th Circuit also said contributes to an appearance of impropriety, even when there is "no reason to believe" that the law clerk had authority to engage in any the decision-making in the case. *Id.* (clerk's receiving parties' positions at a hearing and later communicating them to judge "contributed to the appearance impropriety").

After acting as such a filter between the parties and the judge, she sent a text message to the attorney for the successful party informing him that she "dealt" with or at least had a part in handling the dispute, thereby hinting at some role in the favorable outcome for his client. Ms. Fernandez then attended an important motions hearing, sitting with the other clerks and appearing to take notes. After the hearing, she communicated with her co-clerk about the resulting orders and made at least two inquiries to him about them.

She then reviewed the substance of at least one order and sent a message to the attorney in this case implying that a filing was imminent, in his client's favor, and a result of her personal efforts. (And, indeed, the filing mysteriously benefitted Defendant beyond the judge's oral ruling the day prior.) After sending those text messages, Ms. Fernandez understood, she now admits,

that they "appeared" improper. Fernandez Decl. at 3. They not only "appeared" improper, however: As this Court later acknowledged, the messages actually *were* "clearly … improper." Tr. Of Emergency Telephone Conference before the Hon. Reggie B. Walton, Aug. 18, 2015, at 12. Had she been truly screened from the case, there would have been no reason for her to have *any* communication with her co-clerk about this case and there is simply no "innocent" explanation for Ms. Fernandez taking *any* action in a case in which her personal *pro bono* attorney is counsel of record.

3.   Case-Law Supports Disqualification In These Circumstances

As a threshold matter, the type of conflicts of interest and corresponding conduct presented here is somewhat unprecedented and certainly not routinely encountered by federal courts. Nonetheless, at least one federal court has dealt with a highly analogous situation in a manner that is instructive. In *In re Scottsdale Pinnacle Assocs.*, Case No. 93-40272 T (Bankr. N.D. Cal. Oct. 31, 1994), attached hereto as **Exhibit C**, a law clerk was hired by counsel for one of the parties and was thereafter screened from the matter by the judge. According to that judge, from the time the law clerk began interviewing with the law firm, she was instructed "to do no more substantive work on any case" in which the law firm represented a party in interest:

> From that time on to the end of her term in August 1994, she in fact did no such work. She did no legal research. I did not confer with her on any substantive matters. I did not ask her to observe and take notes of any court proceedings in such cases.
>
> However, I did not disclose to the parties in interest in any such cases that [the law clerk] had accepted future employment with [the law firm]. Additionally, I did not completely seal her off from the case.

*In re Scottsdale Pinnacle Assocs.*, at *4.

As the Ninth Circuit later recognized, "the 'Chinese wall' was not as impermeable as it should have been, for the law clerk continued to have *some contact* with the case." *First Interstate Bank of Ariz.*, 210 F.3d at 984 (emphasis added). Indeed, despite being forbidden to do any "substantive work" on one of the law firm's cases, and in fact doing no such "substantive" work, the law clerk was permitted to review the qualifications of professionals applying to work on the law firm's cases, "accept routine phone calls pertaining to procedural matters in such cases[,]" and "observe courtroom proceedings in such cases for her own interest." *Id.* Recusal of the judge was sought pursuant to § 455(a).

The trial judge began her analysis by acknowledging that, in cases where recusal was deemed required because of a law clerk's conflict of interest, "the law clerks had performed substantive work on the proceedings in question," and that, in cases where it was determined that no recusal was required, "disclosure had been made and the law clerk had been *completely sealed off* from participation in the case." *Id.* at *5 (emphasis added) (citing *Hall*, 695 F.2d 175; *Miller Indus. v. Caterpillar Tractor Co.*, 516 F. Supp. 84 (S.D. Ala. 1980); *Milgard Tempering*, 902 F.2d 703; *Hunt v. American Bank & Tr. Co. of Baton Rouge*, 783 F.2d 1011 (11th Cir. 1986)).

Because the law clerk was not "completely sealed off" and performed <u>non-substantive</u> work on the case—which did *not* include research or conferring with the judge, but did include taking "routine phone calls pertaining to procedural matters" and observing courtroom proceedings "for her own interest"—the judge held that "it is impossible for me to say that [the law clerk's] undisclosed acceptance of future employment with an attorney for one of the parties did not … create an appearance of impropriety." *Id.* at *6. The judge therefore decided that she had violated § 455(a) by failing to disclose the law clerk's conflict of interest "and by not more

completely disassociating her from the case." *Id.* Another judge on the court later agreed that the clerk's participation was improper and a new trial was ordered. *First Interstate Bank of Ariz.*, 210 F.3d at 984.

In subsequent related proceedings in the Ninth Circuit, the appellate panel stated that the trial judge had failed to "insulate" or "screen off" the clerk "*completely*," in violation of the Code of Judicial Conduct and that the actions of both the law clerk and judge created an appearance of impropriety requiring the judge's recusal. *Id.* (emphasis added). The Ninth Circuit also observed that the judge's telling the law clerk merely "not to do *substantive* work" on the case "did not go far enough to forestall recusal." *Id.* at 989 (emphasis in original). These facts align closely with those presented in this case.

Here, Ms. Fernandez was only told not to do <u>substantive</u> work in this case, in contrast with her initial instruction that she should not have <u>any participation</u> in a Zuckerman Spaeder case at all. Among other tasks, she handled telephone calls in the case and attended hearings, exact factors requiring recusal in *In re Scottsdale Pinnacle Associates*. Particularly as the Court did not disclose her conflicts of interest to Plaintiff, such screening was insufficient. Moreover, the whole of the law clerk's conduct and the resulting impression of impropriety went beyond that of the clerk in *In re Scottsdale Pinnacle Associates*.

4. <u>The Totality Of Circumstances Create an Appearance of Impropriety</u>

In addition to the Ms. Fernandez's handling telephone calls in the case and attending proceedings, she communicated with other clerks about orders in the case[13], orders that materially differed from the judge's rulings in open court. She also engaged in immediate *ex*

---

[13] These communications are inconsistent with general ethical codes for attorneys and law firms, which set strict prohibitions on any and all communications with the screened individual about the case posing the conflict of interest. *See* Expert Aff. at 10.

*parte* communications with a party in the case regarding her participation in telephone calls and upcoming decisions, communications in which she demonstrated actual bias in favor of that party. Such *ex parte* communications only underscore the appearance of impropriety:

> It is rarely possible to prove to the satisfaction for the party excluded from the [*ex parte*] communication that nothing prejudicial occurred. The protestations of the participants that the communication was entirely innocent may be true, but they have no way of showing it by their own self-serving declarations. This is why the prohibition is not against 'prejudicial' *ex parte* communications, but against *ex parte* communications.

*In re Wisconsin Steel Co.*, 48 B.R. 753, 760 (N.D. Ill. 1985). Indeed, courts have held that a law clerk's transmittal of confidential information to an attorney in the case can "create a reasonable suspicion … that she was an active partisan who was willing to break the rules to benefit" that attorney. *Vaska*, 955 P.2d at 946. Therefore, not only was Ms. Fernandez's direction to avoid substantive work in the case insufficient to forestall recusal, her actions have created an even greater appearance of impropriety than in *In re Scottsdale Pinnacle Associates*.

As in *In re Scottsdale Pinnacle Associates*, courts have also considered the failure of a judge to disclose the law clerk's conflict of interest as a factor in whether an appearance of impropriety has been created. *See, e.g., Mathis*, 787 F.3d at 1313 (stating that "it would have been better for everyone involved if the judge had promptly disclosed the law clerk['s] … relationship to the parties" but holding that other circumstances eliminated the appearance of impropriety).[14] A judge should disclose the basis on which a reasonable person might "harbor doubts" about the court's impartiality. *Hall*, 695 F.2d at 180 (citing *Potashnick v. Port City Constr. Co.*, 609 F.2d 1101, 111 (5th Cir.)). Accordingly, it may be appropriate for the judge to

---

[14] Some courts have made clear, however, that such disclosure is not necessarily mandatory. *See U.S. v. Reggie*, Criminal Action No. 13-111-SDD-SCR, 2014 WL 1664256 at *2 (M.D. La. April 25, 2014).

"promptly disclose[]" a law clerk's conflict of interest to the parties. *Mathis*, 787 F.3d at 1313; *see also Parker*, 855 F.2d at 1525 (circumstances raising the appearance of impropriety should be "fully disclosed" to the parties).

Here, however, neither the Court nor Zuckerman Spaeder ever informed Plaintiff of Ms. Fernandez's familial relationship with a Zuckerman Spaeder "long-time" partner, her status as a nonpaying client of one of the attorneys in the case and Zuckerman Spaeder during the pendency of the proceedings, or her other conflicts of interest, until after she at least twice engaged in unethical *ex parte* communications with the law firm. Plaintiff was left in the dark with no basis to inquire or object until after Ms. Fernandez's misconduct was revealed (though it has still not been fully disclosed to Plaintiff how that conduct was revealed). This failure to advise Plaintiff of the conflict of interest precluded her from addressing the issue with opposing counsel and the Court, additionally contributing to the appearance of impropriety.

5.   The Order Ms. Fernandez Claimed Responsibility for Further Appears Improper

The substance of the order at the heart of Ms. Fernandez's *ex parte* communications is also significant. Ms. Fernandez first made multiple inquiries to her co-clerk about that filing, then reviewed it and contacted her father and the Defendant's actual attorney to alert them that it would be favorable to their case. That order provided a direct, plain benefit to Defendant that was <u>not</u> granted during the hearing: Although Defendant had not filed a motion asking to reopen Plaintiff's deposition based on her grand jury testimony, Plaintiff did not have an opportunity at the hearing to present any argument on this issue, and Judge Walton had declined to rule on it, the order granted Defendant the option to do exactly that. That fact is significant because Ms. Doe has been subjected to more than two days of deposition, resulting in a transcript of more than 500 pages; requiring her to take off more time from work and travel from her home in New

Jersey to Washington for an extensive third round of deposition would unjustifiably impose an additional burden on her.

This materially different order—in combination with the law clerk's communications with the drafting clerk about it and her representations to a party that she improperly influenced its contents—is a circumstance too questionable to be ignored in assessing the appearance of impropriety. Because of the totality of the irregular occurrences that have come to light, and the incurable appearance that has resulted, the judge should recuse himself even if he himself is satisfied that the contents of the order were proper and it was properly assembled.

Lastly, the parties have been advised that, within a week of this motion, Ms. Fernandez's clerkship with the Court will end. *See* Fernandez Decl. at 2 n. 5 (identifying Sept. 4, 2015, as the final day of her clerkship). This will not, however, remove any questions of past impropriety nor moot Plaintiff's reasonable concerns. "When … a judge is confronted with a situation where the appearance of impropriety is already established, a taint on the judicial system remains as long as he presides over the case[.]" *Fredonia Broad.*, 569 F.2d at 256. Therefore, disqualification is appropriate regardless of whether Ms. Fernandez will soon have no further contact with the case.

## <u>CONCLUSION</u>

The facts of this case give rise to an appearance of impropriety that is far more pronounced than the hypothetical conflicts service as a law clerk routinely presents. Combined with obvious, undisclosed conflicts of interests, the law clerk's actions here give rise to serious questions about issues of fairness, transparency, and judicial transparency. At the very least, Plaintiff is entitled to conduct her own full investigation regarding the precise communications between the law clerk, her personal lawyer (also Defendant's lawyer), her father, and other members of Zuckerman Spaeder, and to ask questions to both law clerks involved. The more

appropriate remedy, and the remedy supported by the facts of this case and the governing law, is for this Court to grant Plaintiff's Motion to Disqualify, disqualify himself from the case, and thereby remove any potential appearance of impropriety.

Dated:  August 28, 2015                  Respectfully submitted,

                                         /s/Steven J. Kelly_____
                                         Steven J. Kelly (DC Bar No. 1021534)
                                         Andrew G. Slutkin (DC Bar No. 433818)
                                         Christopher Mincher, (admitted *pro hac vice*)
                                         SILVERMAN|THOMPSON|SLUTKIN|WHITE|LLC
                                         201 North Charles Street, Suite 2600
                                         Baltimore, Maryland 21201
                                         Tel:  (410) 385-2225
                                         Fax: (410) 547-2432
                                         skelly@mdattorney.com
                                         aslutkin@mdattorney.com
                                         cmincher@mdattorney.com

                                         *Attorneys for the Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that true and correct copies of the foregoing **MOTION TO DISQUALIFY & MEMORANDUM IN SUPPORT THEREOF** were electronically filed with the Clerk of the Court by using the CM/ECF system, which will furnish electronic copies to all counsel.

Dated at Baltimore, Maryland, this 28th day of August 2015.

                                         /s/_Steven J. Kelly_____
                                         Steven J. Kelly (DC Bar No. 1021534)